## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ERNEST R. JAMISON,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:07-cv-152
(Dlott, J.; Hogan, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and Supplemental Security Income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 6), and the Commissioner's response in

opposition. (Doc. 9).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1951 and was 54 years old at the time of the ALJ's decision.

Plaintiff has a seventh grade education and past work experience as a construction laborer and

truck driver. Plaintiff filed applications for DIB and SSI in March 2004 with a protective filing

date of February 26, 2004, alleging an onset of disability of October 2, 1998, due to lower back

pain, bone spurs, and numbness in his extremities. (Tr. 80). Plaintiff's applications were denied

initially and upon reconsideration. Plaintiff then requested and was granted a de novo hearing before an administrative law judge (ALJ). Plaintiff, who was represented by counsel, appeared at two hearings before ALJ Samuel Rodner. At the second hearing, a Vocational Expert (VE) and medical expert appeared and testified.

On July 31, 2006, the ALJ issued a decision denying plaintiff's DIB and SSI applications. The ALJ determined that plaintiff suffers from severe lumbar disc disease (Tr. 16), but that such impairment did not meet or equal the Listing of Impairments. (Tr. 16). The ALJ also determined that plaintiff did not have a severe cardiac impairment. *Id.* According to the ALJ, plaintiff retains the residual functional capacity (RFC) for a range of medium work, with lifting up to 50 pounds occasionally and 25 pounds frequently, but he should avoid work involving concentrated exposure to fumes, odors, and gases, unprotected heights, and hazardous machinery. (Tr. 17). The ALJ determined that plaintiff was not fully credible. (Tr. 19-20). The ALJ determined that plaintiff could not perform his past relevant work, but based on the vocational expert's testimony, could perform other jobs that exist in significant numbers in the national economy. (Tr. 18). Consequently, the ALJ concluded that plaintiff is not disabled under the Act and therefore not entitled to disability benefits. The Appeals Council denied plaintiff's request for review making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial

2

evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

3

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that

4

such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004); *Walters*, 127 F.3d at 530. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). In weighing the various opinions and medical evidence, the ALJ must consider other pertinent factors such as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson*, 378 F.3d at 544. In terms of a physician's area of specialization, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits

6

granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. 1990) (unpublished), 1990 WL 94. Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

7

## OPINION

The pertinent medical findings and opinions have been adequately summarized by the parties in their briefs (Doc. 6 at 1-4; Doc. 9 at 2-7) and will not be repeated here. Where applicable, the Court shall identify the medical evidence relevant to its decision.

Plaintiff assigns three errors in this case. First, plaintiff contends the ALJ erred by not finding him disabled under grid rule section 201.10. Second, plaintiff asserts the ALJ erred by giving greater weight to a non-treating physician and examining consultant than to plaintiff's treating physicians. Third, plaintiff argues the ALJ erred by not finding plaintiff's heart disease to be a severe impairment. For the reasons that follow, the Court finds the ALJ's decision is not supported by substantial evidence and should be reversed and remanded for further proceedings.

Plaintiff contends the ALJ erred by not finding his cardiac impairment to be a severe impairment. A severe impairment is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

Plaintiff's history is significant for coronary artery disease for which he was treated with balloon angioplasty and stent implantation in 1996. (Tr. 187-88).

8

In March 2004, plaintiff began treating with cardiologist Stephen Meyers, M.D. (Tr. 137-138). Plaintiff presented with atypical chest pain and his EKG was normal. Dr. Meyers planned to start plaintiff on a cholesterol-lowering medication given his history of coronary disease. (Tr. 138).

In May 2004, Dr. Meyers reported that plaintiff was doing well with no symptoms of chest pain, but noted he experienced low back pain and some leg numbness. (Tr. 150). Dr. Meyers noted plaintiff did not have any significant symptoms of angina. *Id.* Plaintiff's medications included Enteric-Coated Aspirin, Diovan and Zocor. *Id.*

In May 2004, Dr. Hinzman, a state agency reviewing physician, reviewed plaintiff's medical records and reported that, with respect to plaintiff's complaints of extremity numbness, his peripheral pulses were normal and arterial Doppler studies were normal. (Tr. 182). Dr. Hinzman noted that plaintiff's cardiac function was normal and his graded exercise tolerance was normal at 10 METs (Tr. 184).

In August 2004, plaintiff had a vascular ultrasound which showed 80-99% stenosis in his right internal carotid artery. (Tr. 206, 212). He was admitted overnight due to complaints of chest pressure radiating to his left arm and neck. (Tr. 224, 229). He was stable with no evidence of ischemia. Plaintiff reported that he smoked one pack of cigarettes daily, and had done so for several years. (Tr. 228). Plaintiff had a normal echocardiogram and chest x-ray. (Tr. 209-211, 230). On August 13, 2004, plaintiff underwent an exercise Cardiolite study. (Tr. 217-218). The EKG portion of the study was abnormal. (Tr. 217). He had a normal perfusion and function exercise study. (Tr. 218).

On October 4, 2004, Dr. J.W. Lee, M.D., surgically removed plaque from plaintiff's right

9

carotid artery. (Tr. 250-251). There were no problems, no neurological symptoms, and plaintiff was discharged on Plavix and Percocet. (Tr. 249).

On November 12, 2004, Dr. Meyers saw plaintiff for a cardiac follow-up. (Tr. 288). Dr. Meyers noted that plaintiff's carotid artery procedure went smoothly and he was doing well with no chest pain, shortness of breath, palpitations or lightheadedness. (Tr. 288). Plaintiff still had complaints of low back pain. (Tr. 288). Dr. Meyers found that plaintiff had stable coronary artery disease, was doing well, and would see him again in six months. (Tr. 288).

There are no treatment notes in the record for a one-year period until November 2005. That month, plaintiff had an abnormal exercise stress test. (Tr. 314, 372). He was hospitalized and underwent a triple coronary bypass. (Tr. 290-291, 369). Plaintiff's postoperative course was smooth and he was discharged on the fourth day. (Tr. 291). On November 30, 2005, Dr. Park, his cardiac surgeon, reported that plaintiff was doing well, had no significant pain, and took no pain medication. (Tr. 368).

In December 2005, a vascular ultrasound showed that plaintiff's right carotid artery was functioning normally, and his left carotid had between 1-15% stenosis. (Tr. 310). There was patent flow in both. (Tr. 310). Dr. Lee noted that plaintiff's right carotid artery looked good, and there were no problems with the left side. (Tr. 328). Dr. Lee no longer needed to see plaintiff and discharged him from care. (Tr. 328). Also in December 2005, Dr. Meyers noted that plaintiff was stable and would be put back on his regular medical regimen, and was to return in three months. (Tr. 367).

In March 2006, plaintiff reported to Dr. Meyers that he was "doing extremely well with no problems." (Tr. 366). Plaintiff had no other problems except for mild incisional pain at times;

10

he had no chest pain, shortness of breath, palpitations, dizziness or swelling. (Tr. 366). Dr.
Meyers noted that plaintiff had good lipid profiles and he planned to continue plaintiff's regular
medical regimen. (Tr. 366).

In April 2006, Dr. Meyers completed a cardiac residual functional capacity assessment
form. (Tr. 362-365). Dr. Meyers opined that plaintiff was limited to sitting for less than two
hours of an eight hour workday, and standing for less than two hours in an eight hour workday.
(Tr. 364). Dr. Meyers also limited plaintiff to "rarely" lifting less than 10 pounds and "never"
lifting over 10 pounds. *Id.* Dr. Meyers opined that plaintiff would need to take unscheduled
breaks every one and one-half to two hours, and would miss more than four days of work per
month. (Tr. 364, 365).

In this case, the ALJ determined that plaintiff's coronary artery disease and carotid artery
disease are not severe impairments. (Tr. 16). The ALJ noted that plaintiff's coronary artery
disease resolved within one week by triple vessel coronary artery bypass surgery in November
2005 and that his carotid artery problems resolved after a right carotid endarterectomy on
October 4, 2004. (Tr. 16). In making this decision, the ALJ gave "great weight" to the testimony
of the medical expert, Dr. Robert Adolph, the cardiologist who testified at plaintiff's second
hearing. *Id.* The ALJ states that Dr. Adolph "correctly pointed out that there have been no
significant clinical signs or laboratory findings of coronary artery disease since the claimant's
coronary artery bypass surgery in November 2005. The same is true regarding the claimant's
carotid arteries since October 4, 2004." (Tr. 16).

The ALJ went on to recount Dr. Adolph's testimony concerning plaintiff's coronary
artery disease. While Dr. Adolph initially testified that plaintiff's "coronary artery disease did

11

not become 'severe' until about one week before the coronary artery bypass surgery [in November 2005]," his subsequent testimony indicated that EKG findings of August 13, 2004 were "positive" and "it was possible that the EKG portion showed cardiac disease which progressively worsened up to the November 2005 need for the triple coronary bypass surgery. In other words, it was possible that the claimant had 'severe' coronary artery disease longer than a week before the coronary artery bypass graft surgery in November 2005. Dr. Adolph, however, admitted that this was highly speculative, and he could not provide any more evidence for this theory." (Tr. 16).

Contrary to the ALJ's representation, Dr. Adolph did not testify that it was "highly speculative" that plaintiff had severe coronary artery disease between August 2004 and November 2005. Rather, in response to the ALJ's question, "Well, what did that tell me then about the probability that he did have the severity of the disease back in August of '04?", Dr. Adolph testified:

> A. Well, I don't think you can say with certainty, but *I think it's not unlikely*. Let me put it that way. I mean the disease is slowly progressive and I think he could have added back in–
>
> Q. Was there any other testing between those dates, August '04?
>
> A. No. I don't think because the cardiolyte was negative nothing was done. You know, he didn't have a cardiac catheterization so we have no idea–
>
> Q. What about, I'm sorry.
>
> ALJ: Let's go off the record.

(Tr. 506-507) (emphasis added). When the hearing resumed, the ALJ asked Dr. Adolph whether he had "anything else [he] want[ed] to say about limitations with the back" to which Dr. Adolph

12

responded, "No." (Tr. 507).

Instead of allowing Dr. Adolph to explain his opinion on plaintiff's cardiac impairment, the ALJ interrupted the Medical Expert's testimony, then went off the record. When the hearing resumed, the ALJ immediately skipped to plaintiff's back impairment without giving Dr. Adolph an opportunity to clarify his opinion on plaintiff's cardiac impairment. Dr. Adolph's testimony that it was "not unlikely" that plaintiff had severe coronary artery disease between testing in August 2004 up to his bypass surgery in November 2005, in the context of his entire testimony, does not support the ALJ's finding of a nonsevere cardiac impairment for this time period.

Dr. Adolph further testified that plaintiff's cardiac impairment "might equal a listing." (Tr. 505). Dr. Adolph testified that plaintiff's August 2004 exercise test showed "the cardiolyte or profusion part of the study was normal, but the EKG was abnormal at that time. And if that was reflecting what was going on and it could from what we know a year later, then his disease could have been documented as early as 8/13/04. . . . But it wouldn't necessarily make a listing, *but it might equal a listing.*" (Tr. 504-505) (emphasis added). If plaintiff's cardiac impairment "might equal a listing" then, by implication, it was at least a severe impairment.

Dr. Adolph testified that he did not think plaintiff was "currently" limited by his cardiac impairment, but that in August 2004 plaintiff might have suffered from the same disease that led to his November 2005 bypass surgery. (Tr. 505). That plaintiff did not "currently" have a severe cardiac impairment at the time of the administrative hearing in May 2006 says nothing about whether plaintiff had a severe impairment between August 2004 and November 2005. Dr. Adolph's testimony, taken as a whole, shows plaintiff's cardiac impairment for this closed period was more than a "slight abnormality" which had such minimal effect on plaintiff that it would

13

not be expected to interfere with his ability to work, *Farris*, 773 F.2d at 90, in other words, a "severe" impairment. Given Dr. Adolph's testimony that plaintiff might equal a listed impairment, the ALJ erred by failing to address whether plaintiff's cardiac impairment was severe during the period of August 2004 through November 2005 and, if so, the impact of his limitations on his RFC for that time period. In view of the above, the Court concludes that the ALJ's cardiac severity finding is without substantial support in the record.

The Commissioner contends that the ALJ's severity finding is not reversible error. (Doc. 9 at 9-10). The Commissioner states that the ALJ was not required to identify each of plaintiff's impairments as "severe" or "non-severe." The Commissioner argues that the ALJ was only required to find a severe impairment or combination of impairments and to consider the functional limitations resulting from all of plaintiff's impairments, including those found not to be severe, citing *Maziarz v. Secretary of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987). (Doc. 9 at 9-10).

In *Maziarz*, the ALJ determined that the claimant suffered from several severe cardiac impairments. The plaintiff argued the ALJ erred by not finding his cervical condition to be a severe impairment at step two of the sequential evaluation process. The *Maziarz* Court found it "unnecessary to decide" whether the ALJ erred in failing to find that the claimant's cervical condition constituted a severe impairment at step two because the ALJ continued with the remaining steps of the sequential evaluation process and considered the plaintiff's cervical condition in determining whether he retained a sufficient residual functional capacity to allow him to perform substantial gainful activity. Therefore, the Court concluded that any alleged error at step two was harmless. As long as the ALJ considers all of a claimant's impairments in the

**14**

remaining steps of the disability determination, the ALJ's failure to find additional severe impairments at step two "[does] not constitute reversible error." *Maziarz,* 837 F.2d at 244. In other words, if an ALJ errs by not including a particular impairment as an additional severe impairment in step two of his analysis, the error is harmless as long as the ALJ found at least one severe impairment, continued the sequential analysis, and ultimately addressed all of the claimant's impairments in determining his residual functional capacity. *See Swartz v. Barnhart,* 188 Fed. Appx. 361, 368, 2006 WL 1972086, 6 (6th Cir. 2006) (citing *Maziarz*).

*Maziarz* is distinguishable from the instant case because it is not clear that the ALJ considered plaintiff's cardiac impairment at the other steps of the sequential evaluation process. There is no evidence that the ALJ addressed or included limitations from plaintiff's cardiac impairment in determining his RFC for the period of August 2004 to November 2005. The ALJ relied on the opinion of the state agency physicians in determining plaintiff has the RFC for medium work. (Tr. 17). These physicians rendered their opinions in May and August 2004 (Tr. 180-85), before the August 13, 2004 study which Dr. Adolph found to be the critical evidence of severity, and before plaintiff's triple bypass surgery in November 2005. The ALJ acknowledged the state agency opinion predates the November 2005 bypass surgery, but stated "the claimant had severe cardiac symptoms for only about one week before the coronary artery bypass surgery." (Tr. 17). If plaintiff's cardiac impairment was in fact severe for the period of August 2004 to November 2005, as Dr. Adolph's testimony indicates, then the ALJ did not consider any limitations imposed by such impairment in rendering his RFC finding for this closed period. The Court cannot say there is substantial evidence to conclude that the ALJ considered plaintiff's cardiac impairment in assessing plaintiff's RFC. Rather, it's clear he did not by finding such

15

impairment not severe. The Court finds that the failure to fully consider plaintiff's cardiac impairment in determining plaintiff's RFC is not harmless error and requires this case to be reversed and remanded for further development and clarification of plaintiff's cardiac impairment during the closed period of August 2004 through November 2005.

However, to the extent plaintiff contends the ALJ erred by not deferring to the RFC opinion of Dr. Meyers, plaintiff's treating cardiologist, for the period subsequent to November 2005, plaintiff's assignment of error is not well-taken. As the ALJ explained in his decision, Dr. Meyers' reported limitations are inconsistent with the objective evidence of record and his own reports. (Tr. 18-19). The abnormal stress test and left heart catheterization cited by Dr. Meyers as the objective evidence supporting his opinion predate plaintiff's November 2005 bypass surgery. (Tr. 18, 362, 187-189, 314, 372). In addition, Dr. Meyers' own notes and records from November 2005, December 2005 and March 2006 are inconsistent with the limitations set forth in his RFC opinion. (Tr. 366-368). By March 2006, Dr. Meyers reported that plaintiff was "doing extremely well with no problems" except for mild incisional pain and that he experienced no chest pain, shortness of breath, palpitations, presyncope, or edema. (Tr. 19, 366). Given the normal clinical findings noted by Dr. Meyers subsequent to the November 2005 bypass surgery, Dr. Park's report that subsequent to the surgery plaintiff was doing well, had no significant pain, and took no pain medication (Tr. 368), Dr. Lee's December 2005 report releasing plaintiff from any further treatment (Tr. 328), and Dr. Adolph's testimony indicating no current cardiac impairment, the ALJ reasonably declined to give any weight to the more restrictive and

16

inconsistent RFC opinion of Dr. Meyers.[1]  Because Dr. Meyers' assessment that plaintiff was

limited to less than sedentary work activity was not fully corroborated by his own reports or the

objective and other substantial medical evidence of record, the ALJ was not bound to give the

treating physician's opinion controlling or even great weight. *Walters*, 127 F.3d at 530. Thus, the

ALJ's decision in this respect is substantially supported by the record.

Likewise, the ALJ's decision declining to give weight to the January 2005 RFC opinion

of Dr. Leeds is supported by substantial evidence. Dr. Leeds, plaintiff's family physician,

provided a residual functional capacity assessment which limited plaintiff to occasional carrying

of ten pounds; limited sitting, standing, and walking for less than two hours; and required

plaintiff be able to alternate positions at will. (Tr. 263-264). In response to the question, "What

medical findings support the limitations?" Dr. Leeds responded, "subjective report & objective

observations during FCE." (Tr. 263).

The ALJ reasonably rejected the extreme functional limitations set forth by Dr. Leeds

given that Dr. Leeds' opinion was unsupported and based "solely on the claimant's subjective

complaints and the findings from a nontreating source, Ms. Padilla." (Tr. 19). The functional

capacity evaluation [FCE] to which Dr. Leeds refers is that of Samantha Padilla, a physical

therapist. (Tr. 262). As the ALJ noted (Tr. 17), because Ms. Padilla was neither a "treating

source" nor an acceptable "medical source" her functional opinion was entitled to no special

deference or weight. *See* 20 C.F.R. 404.1513(a) (acceptable medical sources include licensed

physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists and

---

[1] To be afforded controlling weight, the opinion of a treating physician must be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and must not be inconsistent with other substantial evidence in the record. *See Walters*, 127 F.3d at 530; 20 C.F.R. § 404.1527(d)(2).

17

qualified speech-language pathologists). *See also Nierzwick v. Commissioner of Social Security,* 7 Fed. Appx. 358, 2001 WL 303522 at * 4 (6th Cir. March 19, 2001) (physical therapist's report not afforded significant weight because the therapist is not recognized as an acceptable medical source). Therefore, the ALJ was entitled to discount Dr. Leeds RFC assessment to the extent it relied upon Ms. Padilla's functional assessment.

In addition, Dr. Leeds' own clinical notes and reports fail to support his extreme limitations. The ALJ correctly noted that while March 2004 x-rays showed severe lumbar degenerative joint and disc disease, Dr. Leeds' physical examination was completely normal with negative straight leg raising and normal neurological findings. (Tr. 19; Tr. 135). In April 2004, Dr. Leeds reported that the MRI showed degenerative changes with a broad disc extrusion at L5-S1, but plaintiff reported "not much pain at present." (Tr. 19; Tr. 144). Plaintiff reported intermittent right leg numbness with increased activity, but Dr. Leeds stated plaintiff was not a surgical candidate. (Tr. 144). Again, Dr. Leeds reported a normal physical examination, including normal neurological findings. (Tr. 144). In June 2004, Dr. Leeds' notes show that plaintiff brought in disability paperwork and that Dr. Leeds "will support claim as needed." (Tr. 153). In July 2004, Dr. Leeds noted "significant symptom exaggeration" with respect to plaintiff's low back pain. (Tr. 205). As the ALJ noted, neither Dr. Leeds, nor any other treating or examining source documented "a musculoskeletal physical exam beyond the normal exam reported by Dr. Leeds." (Tr. 19). Given the lack of clinical correlation supporting the extreme limitations set forth by Dr. Leeds, and the fact that Dr. Leeds' RFC was based in part on plaintiff's subjective complaints which, as explained below, were not fully credible, the ALJ's decision to not give any weight to Dr. Leeds' RFC opinion is supported by substantial evidence.

18

To the extent plaintiff also contends the ALJ erred in finding his testimony not credible,

plaintiff's contention is without merit. The ALJ gave several reasons for his credibility finding.

The ALJ noted that despite plaintiff's allegations of disabling back pain, he has never seen a back

specialist. The ALJ also noted that plaintiff has never taken any prescribed pain medication or

even over-the-counter medication for his pain although he has a medical card and affordability of

prescription medication is not an impediment to treatment. (Tr. 20, 485). The ALJ reasonably

considered plaintiff's conservative treatment, which did not include pain medications, as a factor

in assessing whether plaintiff's symptoms were as disabling as he claimed. The ALJ also

considered plaintiff's daily activities and the lack of third party corroboration which detracted

from his allegations of disabling limitations. (Tr. 20). In light of the Commissioner's opportunity

to observe the individual's demeanor, the Commissioner's credibility finding is entitled to

deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.

2001); *Kirk,* 667 F.2d at 538. In view of the inconsistencies cited by the ALJ in his decision and

lack of objective evidence supporting the extent of impairment claimed by plaintiff, the ALJ's

credibility determination is supported by substantial evidence and should be affirmed.

Finally, plaintiff contends the ALJ erred by not finding him disabled under grid rule

section 201.10, which provides a finding of disability for a claimant limited to sedentary work,

who is of advanced age with a limited education. Plaintiff's contention cannot be sustained

because it is premised upon a finding that the RFC opinions of Drs. Meyers and Leeds, who

limited plaintiff to less than sedentary work, are entitled to controlling weight. As explained

above, the ALJ's decision declining to give any weight to the RFC assessments of these doctors

is based on substantial evidence in the record. Therefore, this assignment of error is without

19

merit.

In conclusion, the Court finds the ALJ erred in assessing plaintiff's cardiac impairment

for the period of August 2004 through November 2005. This matter should be reversed and

remanded for further proceedings consistent with this decision.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner by **REVERSED** and **REMANDED** for further

proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _6/12/08_

Timothy S. Hogan
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ERNEST R. JAMISON,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:07-cv-152
(Dlott, J.; Hogan, M.J.)

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).